**VALENTINE COMPANY (f/k/a Nichols & Associates, Inc.), Petitioner**

v.

**COMMONWEALTH of Pennsylvania, Respondent.**

Commonwealth Court of Pennsylvania.

Argued March 31, 2009.

Decided June 8, 2009.

Maura Fay McIlvain, Philadelphia, for petitioner.

John J. Butchar, Sr. Deputy Attorney General, Harrisburg, for respondent.

BEFORE: LEADBETTER, President Judge, and PELLEGRINI, Judge, and KELLEY, Senior Judge.

OPINION BY Senior Judge KELLEY.

## I. Background

■■ Valentine Company (f/k/a Nichols & Associates, Inc.) (Valentine) petitions for review of the order of the Pennsylvania Board of Finance and Revenue (Board)[1] refusing Valentine's petition for review of the Pennsylvania Department of Revenue's (Department) determination of its surplus lines tax obligation imposed on gross premiums for the tax year ending December 31, 2004 (2004 tax year) pursuant to the provisions of Article XVI of The Insurance Company Law of 1921 (Insurance Law).[2] We affirm.

Valentine is an insurance company licensed to carry surplus lines of liability insurance in Pennsylvania.[3] An excess healthcare professional liability policy in the amount of $25,000,000.00, Policy No. 6791291 (Policy), was issued by Lexington Insurance Company through Valentine for the policy period July 1, 2004 through July 1, 2005. Temple University—of the Commonwealth System of Higher Education, the Temple University Health System, and a number of their subsidiaries, unincorporated divisions, and employees (collective-

---

1. Although we review the orders of the Board in our appellate jurisdiction, in such a proceeding the Court essentially functions as a trial court under Pa.R.A.P. 1571. *Armco, Inc. v. Commonwealth*, 654 A.2d 1191 (Pa.Cmwlth. 1993). As the parties in this matter have filed a stipulation of facts pursuant to Pa.R.A.P. 1571(f), the facts as stipulated are binding and conclusive. *Brown v. Commonwealth*, 670 A.2d 1222 (Pa.Cmwlth.1996). Nevertheless, this Court may draw its own legal conclusions from the stipulated facts. *Id.*

2. Act of May 17, 1921, P.L. 682, *as amended, added by* the Act of December 18, 1992, P.L. 1519, 40 P.S. §§ 991.1601–1625. More specifically, Section 1621 of the Insurance Law provides:

   (a) There is hereby levied a tax of three per centum (3%) on all premiums charged for insurance which is placed with either an eligible surplus lines insurer, other than a risk retention group, or other nonadmitted insurer in accordance with this article, such taxes to be based on the gross premiums charged less any returned premiums. This tax shall be in addition to the full amount of the gross premium charged by the insurer for the insurance. The tax on any unearned portion of the premium shall be returned to the insured.

   40 P.S. § 991.1621(a).

   In addition, pursuant to Section 1621(c), "[t]he surplus lines licensee shall collect from the insured or the producing broker the amount of the tax at the time of delivery of the initial policy;...." 40 P.S. § 991.1621(c). This is because Section 1621(b) provides that "[n]either the surplus lines licensee nor the producing broker shall pay directly or indirectly such tax or any portion thereof...." 40 P.S. § 991.1621(b).

3. As the Pennsylvania Superior Court has noted:

   A surplus lines carrier is an unlicensed insurer designated by the insurance commissioner to provide insurance to Pennsylvanians which they would not otherwise be able to procure, provided that a licensed agent has made a diligent effort to procure such insurance from a licensed insurer, that the premium charged is not lower than the lowest premium approved by the commissioner for use by a licensed insurer, and that the policy or contract does not differ materially from the policies or contracts customarily used by licensed insurers. 40 P.S. § 1006.4 (repealed, now 40 P.S. § 991.1604).

   *Tudor Insurance Company v. Township of Stowe*, 697 A.2d 1010, 1018 n. 7 (Pa.Super.1997).

ly, Temple) were included as some of the named as insureds on the Policy.[4] Temple paid the premiums for the Policy, totaling $6,800,000.00 for the relevant policy period.

4. The parties have stipulated to the following facts regarding the Policy:

> 28. The purpose of the professional liability insurance under the policy was to provide coverage for provision of health care services by Temple University and its affiliates that provide health care.
>
> 29. Medical malpractice liability insurance was a line of insurance coverage generally unavailable from a carrier admitted in Pennsylvania and was therefore listed on the insurance coverage eligible for export list published by the Insurance Commissioner in the Pennsylvania Bulletin.
>
> 30. The additional named insureds under the policy are affiliates of Temple University that provide health care services and individuals who render professional services on behalf of Temple University and its health care affiliates.
>
> * * *
>
> 32. For purposes of this litigation, Temple University, Temple University Hospital, Inc., and Temple University Children's Medical Center are the entities for whom immunity from surplus lines tax is claimed. All three are 501(c)(3) entities.
>
> 33.· For purposes of this litigation, it is agreed that 87.43% of the premium for the policy is allocable to the entities claiming immunity from surplus lines tax (Temple University—27.37%, Temple University Hospital, Inc.—55.64%, and Temple University Children's Medical Center—4.42%) and 12.57% is allocable to other entities for whom immunity from surplus lines tax is not claimed.
>
> * * *
>
> 35. The Commonwealth owns portions of the Temple University campus, including that portion of land upon which Temple University Hospital, Inc. is situated.
>
> 36. Temple University Hospital, Inc. and Temple University Children's Medical Center resulted from a reorganization of Temple University in 1996 that involved a corporate division and merger pursuant to the Nonprofit Corporation Law of 1988, as amended, 15 Pa.C.S. §§ 5101[–6162].

On January 7, 2005, Valentine filed a timely Surplus Lines Tax Report with the Department for the 2004 tax year. Although Valentine reported the gross premiums for the Policy, it deducted those premiums from the gross premiums taxable in the report.[5]

> 37. The purpose of the policy is to provide medical malpractice coverage for health care services provided primarily by Temple University, Temple University Hospital, Inc., and Temple University Children's Medical Center.

Stipulation of Facts at 5–6.

5. Valentine did not collect the surplus lines tax from Temple, pursuant to the provisions of Section 1621(c) of the Insurance Law, due to the longstanding belief that Temple was not subject to the tax. On December 2, 1966, an Opinion was issued by a former Deputy Attorney General to the then Acting Department Secretary in which he interpreted the provisions of a prior version of the Insurance Law, Act No. 531 of 1966, regarding the types of entities that were not subject to the surplus lines tax. *See* Stipulation of Facts, Exhibit G. In the letter, the former Deputy Attorney General determined that the tax provisions in the prior version of the Insurance Law were not applicable to the premiums collected from local political subdivisions such as counties, municipalities, and authorities, or from unincorporated charitable, religious, and educational institutions. *See id.* at 3, 4. In a letter dated August 2, 1989, the Department informed a former Temple insurance broker of its determination that, based on the former Attorney General's Opinion, "[a] political subdivision or instrumentalities of the Commonwealth, such as school districts, are not liable under a general taxing statute unless the statute specifically includes consideration of taxes paid by the political subdivisions or instrumentalities[, and the Insurance Law] has no provisions for such consideration." Stipulation of Facts, Exhibit H. In addition, on April 9, 1993, a Department taxing officer executed a Computation Work Sheet in the resettlement of the former broker's report for the tax year ending December 31, 1991, in which he stated "[R]evise resettlement to allow additional reduction in taxable gross premiums for Temple University—per the Temple—Commonwealth Act they are an instrumentality of the Commonwealth and are therefore

## II. Determinations

On September 23, 2005, the Department mailed a settlement to Valentine for the 2004 tax year. The settlement assessed an additional tax due in the amount of $204,000.00, representing the 3% surplus lines tax imposed under Section 1621(a) of the Insurance Law on the gross premiums of $6,800,000.00 for the Policy.

On October 18, 2005, Valentine filed a timely petition for resettlement with the Department, arguing that Temple was immune from the surplus lines tax because it is an instrumentality of the Commonwealth. On March 20, 2006, the Department issued a decision and order denying Valentine's petition for resettlement.

On May 1, 2006, Valentine filed a petition for review of the decision and order with the Board. On September 15, 2006, the Board issued an opinion and order disposing of Valentine's petition in which it made the following relevant conclusion:

> [Valentine]'s gross premiums tax shall not be resettled. Temple University, its numerous affiliated entities, and the individuals employed or contracting with Temple and its affiliated entities are not governmental entities entitled to a presumption of tax immunity. See *Mooney v. Temple University Board of Trustees*, 448 Pa. 424[, 292 A.2d 395] (1972); see also *Doughty v. City of Philadelphia*, 141 Pa.Cmwlth. 659, 596 A.2d 1187

[(1991)]. As the statute does not exempt any premiums from tax and government tax immunity does not apply, the premiums received by [Valentine] from policy # 6791291 are subject to the surplus lines tax.

Board Opinion at 6. Based on the foregoing, the Board issued an order refusing Valentine's petition for review, and sustaining the Department's decision and order. *Id.* at 7. Valentine then filed the instant petition for review in this Court from the Board's order.

## III. Issues

■ In this case, Valentine claims: (1) that the Board erred in refusing its petition for review and sustaining the Department's decision and order because Temple is immune from the surplus lines tax as it is a Commonwealth instrumentality under the provisions of the Temple University— Commonwealth Act (Temple Act)[6]; and (2) that even if it is assumed that Temple is not immune from the surplus lines tax, any change in Temple's immunity from the tax should only be prospectively applied.[7]

## IV. Discussion

■ Valentine first claims that the Board erred in refusing its petition for review and sustaining the Department's decision and order because Temple is immune from the surplus lines tax as it is a

---

not taxable...." Stipulation of Fact, Exhibit I at 2. However, following the enactment of the present form of the Law in 1992, on November 8, 2004, the Pennsylvania Surplus Lines Association issued a Special Bulletin to surplus lines licensees informing them that, as of August 6, 2004, the Department was recognizing that unincorporated charitable, religious, and educational institutions were no longer exempt from the tax. *See* Stipulation of Fact, Exhibit J.

6. Act of November 30, 1965, P.L. 843, *as amended*, 24 P.S. §§ 2510–1–2510–12.

7. In this case, Valentine also raises a claim regarding the applicability of the Commonwealth Attorneys Act, Act of October 15, 1980, P.L. 950, *as amended*, 71 P.S. §§ 732–101– 732–506. However, this claim has been waived and will not be reviewed by this Court because it is not fairly comprised in the objections raised by Valentine in the petition for review that was filed in this Court. Pa.R.A.P. 1571(c); *House of Lloyd v. Commonwealth*, 684 A.2d 213 (Pa.Cmwlth.1996), *aff'd*, 694 A.2d 375 (Pa.Cmwlth.1997).

Commonwealth instrumentality under the Temple Act.[8] More specifically, Valentine alleges that a number of provisions in the Temple Act demonstrate that Temple is an instrumentality of the Commonwealth.[9]

In addition, Valentine sets forth instances in which the Department has previously recognized that Temple is immune from other taxes as a Commonwealth instrumentality.[10] Further, Valentine points to

8. It should be noted that, in this case, Valentine does not allege that Temple is exempt from the surplus lines tax under the relevant provisions of Article 8, Section 2 of the Pennsylvania Constitution or the Institutions of Purely Public Charity Act, Act of November 26, 1997, P.L. 508, 10 P.S. §§ 371–385. Rather, Valentine's sole claim in this matter is that Temple is immune from the tax as an instrumentality of the Commonwealth under the Temple Act. This is a distinction with a difference. *See, e.g., SEPTA v. Board of Revision of Taxes,* 574 Pa. 707, 712–714, 833 A.2d 710, 713 (2003) ("It is well settled that tax immunity is distinct from tax exemption. . . . The elementary premise underlying taxation is that the power to tax is exclusively vested within the legislature. 'Property is immune from taxation if the taxing body has not been granted the authority to levy a tax.' As a general matter, property owned by the Commonwealth and its agencies is immune from taxation by a local subdivision in the absence of express statutory authority. . . . Thus, in order to tax property owned by the Commonwealth, a local subdivision must establish that it has the authority to tax such property. On the other hand, tax 'exemption' carves out specified property from taxation that the taxing body otherwise has the authority to tax. The exemptions are a result of Article VIII, Section 2 of the Pennsylvania Constitution, which provides that the General Assembly may by law exempt from taxation certain classes of property, including 'that portion of public property which is actually and regularly used for public purposes.' Thus, unlike immunity situations, the property is presumed to be subject to a tax unless specifically excluded and the taxpayer must establish that the property is exempt from taxation. Thus, the primary distinction between 'immunity' and 'exemption' is simply that 'the ordinary presumption against exemption does not apply where the property involved is owned by the Commonwealth, since such property has for reasons of public policy been consistently recognized as free from taxation.' ") (citations omitted).

9. In particular, Section 2 of the Temple Act states that the express intent of the General Assembly was to extend educational opportunities "[b]y establishing Temple University as an instrumentality of the Commonwealth to serve as a State-related institution in the Commonwealth system of higher education." 24 P.S. § 2510-2. The Temple Act also directed that its name be changed to "Temple University—of the Commonwealth System of Higher Education", and that a third of its Board of Trustees be designated as Commonwealth trustees. *See* Sections 3 and 4 of the Temple Act, 24 P.S. §§ 2510-3, 2510-4. In addition, the General Assembly exerted control over the tuition and fees that could be charged, permitted Temple to share in programs with "State colleges" for capital development and improvement, and provided for it to receive funds appropriated by the General Assembly subject to a number of restrictions. *See* Sections 7 and 8 of the Temple Act, 24 P.S. §§ 2510-7, 2510-8. Under the statute, Temple is also empowered to issue tax-exempt bonds, and the President is required to submit an annual report of all activities of the university. *See* Sections 9 and 10 of the Temple Act, 24 P.S. §§ 2510-9, 2510-10.

10. As outlined in Exhibit N of the Stipulation of Facts, the Department has repeatedly recognized Temple's immunity from the sales and use tax under Section 202 of the Tax Reform Code of 1971 (Tax Code), Act of March 4, 1971, P.L. 6, *as amended,* 72 P.S. § 7202. More specifically, the Department recognizes that Temple is immune from the sales and use tax under Section 204(12) of the Tax Code which excludes from the tax "[t]he sale at retail to, or use by . . . this Commonwealth or its instrumentalities or political subdivisions of tangible personal property or services." 72 P.S. § 7204(12). Likewise, Section 91.195(a)(3) of the Pennsylvania Code specifically includes Temple in the "Commonwealth instrumentalities" that are excluded, under Section 91.192(a) of the Pennsylvania Code, from the realty transfer tax imposed under Section 1102–C of the Tax Code, *added by* Act of May 5, 1981, P.L. 36, *as amended,* 72 P.S. § 8102–C. 61 Pa.Code §§ 91.192(a), 91.195(a)(3).

Exhibits G, H, and I of the Stipulation of Facts, outlined above, in which the Department considered Temple to be immune from the surplus lines tax as a Commonwealth instrumentality from 1966 up until 2004. Based on the foregoing, Valentine asserts that Temple is immune from the surplus lines tax and, as a result, the Board's order in the case *sub judice* should be reversed.

■ In determining whether an entity is an agency or instrumentality of the Commonwealth for both tort and tax immunity purposes, this Court examines the entity's enabling legislation. *Bucks County Community College v. Bucks County Board of Assessment Appeals*, 147 Pa.Cmwlth. 505, 608 A.2d 622 (1992). As noted by Valentine, Section 2 of the Temple Act provides that Temple is "[a]n instrumentality of the Commonwealth to serve as a State-related institution in the Commonwealth system of higher education." 24 P.S. § 2510–2.

However, under Section 3 of the Temple Act, the General Assembly specifically provided that Temple "[s]hall continue as a corporation for the same purposes as, and with all rights and privileges heretofore granted to, Temple University, unless hereinafter modified or changed." 24 P.S. § 2510–3. Thus, Section 3 of the Temple Act explicitly preserved Temple's status as a non-profit corporation chartered for educational purposes.

11. Although the Board relied upon *Mooney* and *Doughty* in disposing of Valentine's petition for review, Valentine does not cite either opinion in the appellate brief that was filed in this Court, or attempt to distinguish either of these controlling cases in any manner.

12. Act of June 21, 1957, P.L. 390, *formerly,* 65 P.S. §§ 66.1–66.9, repealed and replaced by Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101–67.3401.

In *Mooney,*[11] the Pennsylvania Supreme Court examined the provisions of the Temple Act relied upon by Valentine in determining whether Temple University was subject to the provisions of the former statute commonly referred to as the Right to Know Law[12] as a "state agency". In concluding that Temple University was not a "state agency", the Supreme Court noted the following regarding the provisions of the Temple Act:

> We conclude, as did the Commonwealth Court, that this latter declaration [in Section 3 of the Temple Act] reveals an express legislative intent to preserve Temple's status as a non-profit corporation chartered for educational purposes. The receipt by Temple of increased state financial aid no more transforms Temple into a state "agency" than the receipt of federal funds can make Temple an agency of the federal government. A review of the [Temple Act] further supports our conclusion.

> Appellants rely on various provisions of the [Temple Act] to bolster their contentions. They emphasize that the act altered the board of trustees by providing for appointment of four trustees respectively by the Governor, the President pro tempore of the Senate, and the Speaker of the House. Nevertheless, these twelve Commonwealth trustees remain only a one-third minority of the board's total number of thirty-six trustees.[13]

13. The distinction between the composition of Temple's Board of Trustees and those of the member schools of the Pennsylvania State System of Higher Education is worth noting. As the Pennsylvania Supreme Court has observed, "[u]niversities that are part of the State System of Higher Education, [established by the State System of Higher Education Act, Act of March 10, 1949, P.L. 30, *as amended, added by* the Act of November 12, 1982, P.L. 660, *as amended,* 24 P.S. §§ 20–2001–A–20–2017–A], are subject to the sys-

The majority of non-public trustees clearly retains the powers to manage and control the University. The act in its legislative findings describing Temple's status prior to passage of the act specifically declares that 'Temple University owns and maintains land, buildings, and other facilities which are used, together with land and buildings owned by the Commonwealth of Pennsylvania, for higher education, *which land, buildings, and other facilities are under the entire control and management of the board of trustees....* The Legislature then expressly directs that '[t]he entire management, control and conduct of the instructional, administrative, and financial affairs of the university is hereby vested in the board of trustees.' Additionally, the act provides that '[t]he board may exercise all powers and franchises of the university and make bylaws for their own government, as well as for the university.'

The act also directs that '[i]n accordance with legislative appropriations made as provided by law, the Commonwealth may, *by agreement with the board of trustees*, acquire lands, erect and equip buildings, and provide facilities for the use of the university. Had the Legislature intended to transform Temple into a 'state agency', it would be hardly necessary to require that the Legislature reach an agreement with the board of trustees before it can expand or alter Temple's facilities. This requirement further supports the conclusion

that Temple is not a state "agency" for present purposes.

Appellants also rely on fiscal controls, provided by the [Temple Act] to facilitate Commonwealth inspection of the University's expenditures of Commonwealth funds, to support their contention that Temple is now a state "agency".

The [Temple Act] has clearly authorized increased financial assistance to Temple from the Commonwealth. The Commonwealth is obligated to provide sufficient funds to enable Temple to maintain the legislatively determined tuition and fee schedules. Temple is permitted to participate in Commonwealth programs for capital development and to support these programs the board of trustees is empowered to issue tax free bonds. It is, of course, a fundamental practice of government that its grants of public funds to an appropriate institution are generally accompanied by some regulatory mechanism in order to insure that the public funds are being properly expended.

*Mooney,* 448 Pa. at 430–432, 292 A.2d at 399–400 (footnotes omitted and emphasis in original).

Based on the foregoing, the court concluded "[t]hat the Legislature by increasing its financial assistance to Temple did not alter Temple's status as a nonprofit corporation chartered for educational purposes and clearly did not transform Temple into a state 'agency' for purposes of the [former Right to Know Law]." *Id.* at 434, 292 A.2d at 400–401.[14] Likewise, as noted

tem's board of governors, all of whom are governmental appointees, 24 P.S. § 20–2004–A(a), and all members of the council of trustees of each of the institutions are appointed by the governor, 24 P.S. § 20–2008–A(a), (b)...." *Pennsylvania State University v. Derry Township School District,* 557 Pa. 91, 96, 731 A.2d 1272, 1275 (1999). Likewise, the Governor appoints the entire membership of

the boards of trustees in the system of state hospitals. *See, e.g.,* Sections 207.1 and 401 of the Administrative Code, Act of April 9, 1929, P.L. 177, added by Act of November 8, 1976, P.L. 1109, *as amended,* 71 P.S. §§ 67.1, 111.

**14.** *See also Burton v. Temple University Law School,* 18 Pa.Cmwlth. 306, 335 A.2d 830, 831 (1975) ("We will dispose of this matter on

above, the parties in this case have stipulated that "Temple University Hospital, Inc. and Temple University Children's Medical Center resulted from a reorganization of Temple University in 1996 that involved a corporate division and merger pursuant to the Nonprofit Corporation Law of 1988 . . . ." Stipulation of Facts at 6. Thus, all of the Temple entities claiming immunity from the surplus lines tax in this case are nonprofit corporations, and not agencies or instrumentalities of the Commonwealth, as alleged by Valentine.

Nevertheless, Valentine points to instances in which Temple is immune from the imposition of a tax as an instrumentality of the Commonwealth. More specifically, Valentine cites to its immunity from the sales and use tax and the realty transfer tax pursuant to Sections 202 and 204(2) of the Tax Code, 72 P.S. §§ 7202, 7204(12), and Sections 91.192(a) and 91.195(a)(3) of the Pennsylvania Code, 61 Pa.Code §§ 91.192(a), 91.195(a)(3).

However, as the Pennsylvania Supreme Court has noted, "[a]n entity's status as an agency or instrumentality [of the Commonwealth] varies, depending on the issue for which the determination is being made." *Pennsylvania State University,* 557 Pa. at 96, 731 A.2d at 1274. In *Doughty,* this Court considered whether Temple was immune from suit because it was an independent agency of the Commonwealth entitled to sovereign immunity.[15] In that case, a court of common pleas concluded that Temple was not immune from liability as an independent Commonwealth agency, relying upon the Pennsylvania Supreme Court's opinion in *Mooney.* On appeal to this Court, Temple argued that *Mooney* did not control the disposition of that case.

In rejecting Temple's assertion regarding the application of *Mooney* to its claim of sovereign immunity, this Court stated the following:

Temple asserts that *Mooney* is inapplicable for three reasons: (1) because *Mooney* limited its analysis to the defi-

---

the narrow but essential question of whether the defendant is a State agency within the meaning of Section 401(a)(1) of the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673[, *formerly,* 17 P.S. § 211.401(a)(1), repealed and replaced by Section 761 of the Judicial Code, 42 Pa.C.S. § 761]. Plaintiff has alleged in Paragraph 2 of her complaint in mandamus that Temple University Law School is a State Agency. However, this Court and the Supreme Court of Pennsylvania have definitely and specifically held [in *Mooney* ], as a matter of law, that it is not. . . . Since Temple is not a State agency but rather a nonprofit corporation chartered for educational purposes, this Court is without jurisdiction and we enter the following ORDER. . . .").

**15.** *See* 1 Pa.C.S. § 2310 ("Pursuant to section 11 of Article 1 of the Constitution of Pennsylvania, it is hereby declared to be the intent of the General Assembly that the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official im-

munity and remain immune from suit except as the General Assembly shall specifically waive the immunity. . . ."); Section 8521(a) of the Judicial Code, 42 Pa.C.S. § 8521(a) ("[E]xcept as otherwise provided in this subchapter, no provision of this title shall constitute a waiver of sovereign immunity for the purpose of 1 Pa.C.S. § 2310 . . . or otherwise."); *Frazier v. Commonwealth,* 845 A.2d 253, 256–257 (Pa.Cmwlth.2004) ("The Commonwealth and its agencies are immune from suit except where the General Assembly specifically waives immunity. 1 Pa.C.S. § 2310; 42 Pa.C.S. § 8521. A commonwealth party is not liable unless (1) the alleged act of the commonwealth party is a negligent act for which damages would be recoverable under the common law or by statute, 42 Pa.C.S. § 8522(a); and (2) the act of the commonwealth party falls within one of the exceptions listed in 42 Pa.C.S. § 8522(b). Exceptions to sovereign immunity must be strictly construed as to uphold legislative intent and insulate the Commonwealth from tort liability.") (citations omitted).

nition of state agency in the Right to Know Act; (2) because *Mooney* was decided 6 years before the sovereign immunity statute was enacted; and (3) because *Mooney* does not consider the effect of the Temple Act's designation of Temple as an "instrumentality" of the commonwealth.

As to the first contention, Temple argues that *Mooney* was decided based on the definition of "state agency" in the Right to Know Act, under which a "state agency" must perform "an essential governmental function". Temple asserts that the definition of "commonwealth agency" applicable to sovereign immunity contains no such restriction.

The Supreme Court in *Mooney* did not limit itself to deciding whether Temple performed "an essential governmental function". Rather, the Supreme Court exhaustively examined the Temple Act, section-by-section, searching for any intent to transform Temple into a state agency and found none.

As to the second contention, Temple states that because *Mooney* was decided before the 1978 sovereign immunity statute was enacted, the holding in *Mooney* that Temple is not a state agency is inapplicable. Temple cites no authority for this position.

The sovereign immunity statute provides the defense of immunity to entities which have the status of commonwealth agency independent of the sovereign immunity statute. The only possible source for Temple's status as a commonwealth agency would be the Temple Act. In *Mooney*, the supreme court held that the General Assembly did not intend the Temple Act to alter Temple's prior status as a non-profit corporation. The subsequent passage of the 1978 sovereign immunity statute did not alter this holding in *Mooney*.

As to the third contention, Temple asserts that the designation of Temple as an "instrumentality of the commonwealth" in the Temple Act transformed Temple into a state agency. Temple states that "instrumentality" is commonly defined as meaning "agency". Temple contends that if "instrumentality" does not mean "agency", inclusion of the term in the Temple Act would serve no purpose.

"Instrumentality" is defined as "1: the quality or state of being instrumental: a condition as serving as an intermediary ... 2a: something by which an end is achieved: MEANS ... b: something that serves as an intermediary or agency through which one or more functions of a controlling force are carried out." Webster's Third International Dictionary 1172 (1986). The definition of "instrumentality" merely denotes that Temple is a means to achieving a purpose. The use of an entity by the commonwealth to achieve a purpose does not in itself transform the entity into a commonwealth agency.

\* \* \*

Contrary to Temple's argument, the term "instrumentality" has not been construed as conveying commonwealth agency status. Accordingly, we conclude that the mere description of Temple as an "instrumentality" of the commonwealth does not entitle Temple to use the defense of sovereign immunity.

We conclude that *Mooney* controls this case, and holds with ample clarity that passage of the Temple Act did not transform Temple into a commonwealth agency. We hold that Temple is not entitled to the defense of sovereign immunity....

*Doughty,* 596 A.2d at 1189–1190, 1191.

■ We conclude that *Mooney* and *Doughty* control the disposition of this

case, and support the conclusion that Temple is not immune from the imposition of the surplus lines tax as an instrumentality of the Commonwealth. It is true that the Department has deigned it appropriate to confer immunity upon Temple from the sales and use tax and the realty transfer tax pursuant to the enumerated provisions of the Tax Code and the Pennsylvania Code. However, in the matter *sub judice*, the only statutory source upon which Valentine relies for its claim of Temple's immunity as a Commonwealth instrumentali-

ty are the provisions of the Temple Act. Under *Mooney* and *Doughty*, it is clear that the General Assembly did not intend such a result because, under the Temple Act, Temple has specifically retained its status as a nonprofit corporation chartered for educational purposes.[16,17] It would certainly be incongruous for this Court to determine in *Doughty* that Temple is not immune from liability as an instrumentality of the Commonwealth, and then to determine in this case that it is immune from

**16.** *See Mooney*, 448 Pa. at 434, 292 A.2d at 400–401 ("[T]he Legislature by increasing its financial assistance to Temple [in the Temple Act] did not alter Temple's status as a nonprofit corporation chartered for educational purposes and clearly did not transform Temple into a state 'agency' for purposes of the [former Right to Know Law]."); *Doughty*, 596 A.2d at 1191 ("Contrary to Temple's argument, the term 'instrumentality' has not been construed as conveying commonwealth agency status. Accordingly, we conclude that the mere description of Temple as an 'instrumentality' of the commonwealth [in the Temple Act] does not entitle Temple to use the defense of sovereign immunity."). *See also Pennsylvania State University*, 557 Pa. at 96–97, 731 A.2d at 1274–1275 ("With regard to immunity from real estate taxes, we view the pivotal factor to be whether the institution's real property is so thoroughly under the control of the Commonwealth, that, effectively, the institution's property functions as Commonwealth property. PSU's property does not meet this test. The reason lies in the composition of the institution's board of trustees. When determining whether an institution is an agency or instrumentality of the government, we must consider whether the Commonwealth has majority control of the board. *Mooney*, 448 Pa. at 431, 292 A.2d at 399. The board of trustees of PSU is not governmental in nature. It is composed of thirty-two members, only ten of whom are public officials.... Given the composition of the board of trustees of PSU, it is clear that the authority to control and dispose of PSU property is not within the purview of the Commonwealth. It cannot be said, therefore, that the real property of PSU is so controlled by the Commonwealth as to fall within the

latter's immunity from local real estate taxation.").

**17.** As noted above, as a corollary to the claim, Valentine points to Exhibits G, H, and I to the Stipulation of Facts in which the Department considered Temple to be immune from the surplus lines tax as a Commonwealth instrumentality from 1966 up until 2004. However, the fact that the Department may have considered Temple to be immune from the surplus lines tax as a Commonwealth instrumentality in the past does not alter our conclusion. It is well settled that the Department cannot be estopped from henceforth collecting the surplus lines tax from Valentine based solely upon its past erroneous failure to do so. *See, e.g., Weinberg v. State Board of Examiners of Public Accountants*, 509 Pa. 143, 151 n. 5, 501 A.2d 239, 243 n. 5 (1985) ("Our holding today does not affect the validity of *Commonwealth v. Western Maryland R.R. Co.*, 377 Pa. 312, 105 A.2d 336 (1954) and cases of similar ilk wherein a party seeks to apply the doctrine of estoppel by laches against the government unit *to prevent it from exercising some governmental function*. For example, in the Western Maryland case, the railroad company sought to prevent the Commonwealth from collecting a particular tax on the grounds that, since the Commonwealth failed to collect such a tax for the twenty years prior, they should be estopped from collecting it then. We held that failure to collect the tax in the past is no bar to present collection. Mistaken indulgence by, or errors of, the Commonwealth in the past does not insulate the taxpayer from tax liability for subsequent years. Our decision today does not alter that result.") (citation omitted and emphasis in original).

a tax on the surplus lines of liability insurance as an instrumentality of the Commonwealth. As a result, Valentine's claim that the Board erred in refusing its petition for review and in sustaining the Department's decision and order based on Temple's immunity from the imposition of the surplus lines tax is patently without merit.

█ Finally, Valentine claims that, even if it is assumed that Temple is not immune from the surplus lines tax, any change in Temple's immunity from the tax should only be prospectively applied. More specifically, Valentine contends that because of Temple's good faith reliance on its tax immune status, equity dictates that any change in Temple's immunity be effective only after a final determination by this Court.

However, the Department notes that, after it had determined that it had not been properly applying the surplus lines tax up to the 2004 tax year, it has only prospectively changed Temple's immunity status and required remission of the tax from the 2004 tax year forward. The Department notes that it has done so, even though it was empowered to resettle the preceding three tax years pursuant to Section 407 of the Tax Code.[18]

Nevertheless, as noted above, Section 1621(c) of the Insurance Law provides, in pertinent part, "[t]he surplus lines licensee shall collect from the insured or the producing broker the amount of the tax at the time of delivery of the initial policy...." 40 P.S. § 991.1621(c). Thus, it was Valentine's obligation under Section 1621(c) of the Insurance Law to collect the surplus lines tax from Temple and to remit it to

the Department. However, Valentine had no notice that it was required to collect the tax from Temple and remit it to the Department prior to the settlement for the 2004 tax year that was mailed by the Department to Valentine on September 23, 2005.

In *Transcontinental Gas Pipe Line Corporation v. Commonwealth*, 153 Pa. Cmwlth. 60, 620 A.2d 614, *aff'd*, 157 Pa. Cmwlth. 674, 630 A.2d 960 (1993), the taxpayer was an out-of-state business that sold gas to Pennsylvania customers. The taxpayer's rates for gas were subject to long-term contracts with its customers that were approved in advance by the Federal Energy Regulatory Commission (FERC), and not subject to change at the taxpayer's discretion. As a result, the taxpayer was required to anticipate and factor into its price all of the taxes that it would incur prior to submitting its rate request to the FERC because the FERC did not allow a taxpayer to recoup · unexpected state taxes from its customers.

The taxpayer did not file utilities gross receipts tax reports with the Department until notified by the Department to do so in 1975. The taxpayer had failed to file the reports on the mistaken belief that its sales were not subject to the tax under the "sale for resale" exemption contained in a former version of Section 1101(a) of the Tax Code, 72 P.S. § 8101(a). From 1975 to 1984, the taxpayer filed the reports with the Department claiming the exemption, and received favorable reports for that period. However, the Department audited the taxpayer's report for 1984, and settled the report determining that the taxpayer

---

**18.** Section 407 of the Tax Code provides, in pertinent part:

(b) If, within a period of three years after the date of any settlement, the department is not satisfied with such settlement, ... the department is hereby authorized and em-

powered to make a resettlement of the tax due by such corporation, based ... upon any information within its possession or that shall come into its possession.

72 P.S. § 7407(b).

owed $102,541.00 in gross receipts tax, and a penalty of $1,275.00, for gas that was not resold for the 1984 tax year. The taxpayer appealed the Department's resettlement to the Board, which denied the appeal.

On appeal to this Court, the taxpayer alleged, *inter alia,* that even if it was subject to the tax, any change in its liability should only be applied prospectively. In disposing of this claim, this Court stated the following, in pertinent part:

[B]ecause [the taxpayer] did not anticipate that it would become subject to the gross receipts tax before 1984, it did not incorporate this cost in its pre–1984 rate requests to FERC. Because [the taxpayer] received favorable reports since it began filing gross receipts tax reports in 1975, it is understandable that [the taxpayer] would continue to believe that its sales were exempt.

In *Abbotts Dairies, Inc. v. Philadelphia,* 436 Pa. 131, 258 A.2d 634 (1969), the Pennsylvania Supreme Court held that, because of the hardship involved, Philadelphia's mercantile license tax could not be assessed retroactively against companies that had relied on their exemption status for 13 years. Citing equitable principles, the Court agreed that the companies could not be taxed because they had reasonably relied upon exempt status and this would create a serious hardship on them, which would far outweigh any good which might be derived from the assessment. Only after the companies were put on *notice* could the city assert tax liability. Because we do not wish to impede or discourage the conduct of commerce, the gross receipts tax liability will be applied only from 1984 onward, the date [the taxpayer] had *notice* of the possibility that it was not exempt from the utilities gross receipts tax. The Department is thereby foreclosed from attempting to

collect utilities gross receipts tax from [the taxpayer] before 1984.

Accordingly, the orders of the Board of Finance and Revenue are affirmed as modified to apply only to prospective enforcement.

*Transcontinental Gas Pipe Line Corporation,* 620 A.2d at 621–622 (footnotes omitted and emphasis in original).

Likewise, in the instant case, Valentine had no notice that it was required to collect the surplus lines tax from Temple and to remit it to the Department prior to the settlement for the 2004 tax year that was mailed by the Department to Valentine on September 23, 2005. As a result, the Department is foreclosed from attempting to collect the surplus lines tax from Valentine prior to the 2004 tax year, and the Board's order will be modified to reflect only prospective enforcement. *Transcontinental Gas Pipe Line Corporation.*

## V. Conclusion

Based on the foregoing, it is clear that the Board did not err in refusing Valentine's petition for review, and in sustaining the Department's determination of its surplus lines tax obligation imposed on gross premiums for the 2004 tax year. However, it is also clear that the Department is foreclosed from attempting to collect the surplus lines tax from Valentine prior to the 2004 tax year, and that the Board's order should be modified to reflect only prospective enforcement. Accordingly, the order of the Board is affirmed as modified.

## *ORDER*

AND NOW, this 8th day of June, 2009, the order of the Board of Finance and Revenue, dated September 15, 2006 at No. 0520040, is affirmed as modified to apply

only to prospective enforcement for the tax year ending December 31, 2004 and subsequent tax years. Judgment shall become final unless exceptions are filed within 30 days of this order pursuant to Pa.R.A.P. 1571(i).