**LUTHER P. MILLER, INC.,** Petitioner

v.

**COMMONWEALTH of Pennsylvania,** Respondent.

Commonwealth Court of Pennsylvania.

Argued Nov. 12, 2013.

Decided March 20, 2014.

Robert Isaiah Boose, II, Somerset, for petitioner.

Clinton G. Smith, Jr., Senior Deputy Attorney General, Harrisburg, for respondent.

BEFORE: LEADBETTER, Judge, and McCULLOUGH, Judge (P), and COLINS, Senior Judge.

OPINION BY Senior Judge COLINS.

Luther P. Miller, Inc. (Petitioner) petitions for review of an order of the Board of Finance and Revenue denying Petitioner's appeal contesting the assessment of deficiency of taxes paid by Petitioner under the Liquid Fuels and Fuels Tax Act (Act).[1] Finding no error, we affirm.

Petitioner is a distributor whose business operations include wholesale and retail sale of petroleum products, including heating oil, dyed kerosene, clear diesel fuel, clear kerosene, propane and special lubricants. (June 11, 2013 Stipulation of Facts (S.F.) Ex. A, Audit Narrative (Narr.) at 1.) Petitioner is headquartered in Somerset, Pennsylvania and was incorporated as a Pennsylvania Corporation in 1961, although it operated prior to that date as a sole proprietorship. (S.F. ¶ 1, Ex. A, Narr. at 1–2.) Following the passage of the Act, Petitioner registered as a Class 1 distributor in 1997. (S.F. Ex. A, Narr. at 1.)

Petitioner operates various facilities in the Commonwealth, including four bulk plant facilities, six cardlock facilities and two facilities on-site at Petitioner's trucking company customers. (Id. at 2.) The cardlock facilities are located at sites owned by another company, Pacific Pride, which reports the sales made from these locations to Petitioner. (Id. at 4–6.) Petitioner has, in total, ten locations (the four bulk plants and the six cardlock facilities) at which it inventories on-road diesel fuel and eight locations (two of the bulk plants and the six cardlock facilities) at which it inventories gasoline. (S.F. ¶ 11.) The on-road diesel and gasoline tanks at the bulk plants are aboveground while the on-road diesel and gasoline tanks at the cardlock facilities are below ground. (Id.)

Petitioner was audited by the Department of Revenue's (Department) Bureau of Audits for the period of January 1, 2006 through July 31, 2008. The audit, including a narrative report of the auditor's findings, was presented to Petitioner at a post-audit conference on December 5, 2008, and the Department's Bureau of Motor Fuel Taxes thereafter issued to Petitioner a Notice of Determination and Request for Payment in the amount of $34,622.26. (S.F. Ex. A, Dec. 15, 2008 Notice of Determination and Request for Payment.) The assessed amount included $33,017.71 in tax due, $840.30 in penalty assessed and $764.25 in interest due. (Id.)

The audit identified three principal issues, which formed the majority of the assessment of deficiency against Petitioner and which are challenged by Petitioner in this appeal.[2] The first issue concerns diesel fuel sales recorded as nontaxable sales to Uniontown School District (School District) at cardlock locations. While sales made to a school district normally qualify as exempt sales to a political subdivision, 1 Pa.C.S. § 1991; 75 Pa.C.S. § 9004(e), the auditor disallowed the claimed exemption on diesel sales to the School District here because the sales were not actually received by or billed to the School District. (S.F. Ex. A, Narr. at 11–12.) Instead, upon review of the fuel delivery tickets, the auditor discovered that some of the tickets documented that the sales were made to bus operator companies that contracted with the School District to provide busing for its students. (Id. at 12.) Of the remaining fuel delivery tickets reviewed by the auditor that were claimed by Petitioner as exempt sales to the School

---

1. 75 Pa.C.S. §§ 9001–9023.

2. The audit also identified several other errors that were not challenged by Petitioner.

District, some did not indicate what entity was billed and others indicated that both the School District and bus operators were the billed entity. (*Id.*) Because the bus operators were neither political subdivisions nor registered distributors, the auditor disallowed the 15,224 gallons of diesel fuel recorded as exempt sales to the School District. (*Id.* at 12, 15, 18.)

The second issue identified by the auditor as a basis for the assessment of deficiency relates to 6,005 gallons of gasoline sales at cardlock locations made to the Somerset County Head Start program. (*Id.* at 10–11, 15, 17.) Somerset County Head Start provides services for Somerset County children aged three to five from low-income families, foster families or other disadvantaged situations. (S.F. Ex. G, April 25, 2013 Deposition of Linda McDonough (McDonough Dep.) at 9–10.) Tableland Services (Tableland), a non-profit community action agency, operates the Somerset County Head Start program on behalf of Somerset County, and its funding is primarily derived from grants from the federal, state and county governments. (*Id.* at 9, 12, 20.) The auditor disallowed the sales to Somerset County Head Start as exempt because, in his view, a Head Start program is not a political subdivision of the Commonwealth and thus ineligible for tax-exempt gasoline purchases. (S.F. Ex. A, Narr. at 10.)

The third basis for the assessment of deficiency was excessive stock loss. The Department's Liquid Fuels and Fuels Tax Audit Manual (Audit Manual) provides for 0.5% allowable stock loss.[3] Petitioner, however, recorded 64,914 gallons of stock loss of gasoline (out of 4,731,324 total gallons of gasoline sold) and 91,608 gallons of stock loss of on-road diesel (out of 12,157,-

484 total gallons of on-road diesel fuel sold) during the audit period; these amounts constituted 1.4% of the total sales for gasoline and 0.8% of the total sales for on-road diesel. (S.F. ¶¶ 12, 14, 15.) For the gasoline loss, the auditor determined that, while gasoline disbursements are subject to temperature variations that can cause loss, in this case it was not possible to conduct a temperature loss analysis because Petitioner's stock control worksheets were not sorted by taxable and non-taxable disbursements and storage location. (S.F. Ex. A, Narr. at 16.) The auditor did review average temperatures for the counties in which Petitioner purchased and sold gasoline and found no basis for the loss reported by Petitioner because four of the counties recorded identical temperatures for every month and the difference in the other counties was minimal. (*Id.* at 17.) For the diesel fuel loss, Petitioner did not offer an explanation, and the auditor could not determine a reason for the excessive loss. (*Id.*) Thus, with no valid explanation for the Petitioner's loss of gasoline or diesel, the auditor found no reason to deviate from the 0.5% allowable stock loss and determined that 41,256 gallons of gasoline and 30,821 gallons of on-road diesel were excessive stock loss. (*Id.*)

Petitioner appealed the Notice of Determination to the Board of Appeals. The Board of Appeals issued a Decision and Order on February 26, 2009, concurring with the assessment of deficiency. (S.F. Ex. C, Feb. 26, 2009 Board of Appeals Decision and Order.) The Board of Appeals concluded that because the Act does not provide for an exemption for taxes on sales to ultimate customers and because Petitioner could not supply the auditor with evidence that the School District paid

---

3. Liquid Fuels and Fuels Tax Audit Manual § FT570, http://www.portal.state.pa.us/portal/server.pt/community/right-to-know_law/

14571/audit_manuals/581045 (last visited Feb. 25, 2014).

for the diesel fuel, the auditor's decision with respect to sales to the School District should stand. (*Id.* at 3.) Regarding the sales to Somerset County Head Start, the Board of Appeals noted that, while in a previous audit the Department affirmed the exemption for sales to Head Start programs, this decision was not correct because Tableland Services is a charitable organization, not a subdivision of the Commonwealth. (*Id.* at 2.) The Board of Appeals concurred with the auditor's decision to adhere to the default 0.5% stock loss without further discussion. (*Id.* at 3–4.) While the Board of Appeals upheld the assessment of tax deficiency, it did abate the penalty assessed to Petitioner because in its view Petitioner acted in good faith and without negligence. (*Id.* at 4.)

Petitioner appealed to the Board of Finance and Revenue, which, by an order dated September 15, 2009, affirmed the Board of Appeals.[4] The Board of Finance and Review held that: (i) despite the fact that the bus operators provided transportation to the School District, which is a political subdivision, they are not themselves political subdivisions; (ii) Tableland Services is a charitable organization, not a state government entity, and thus not entitled to exemption from taxation under the Act; and (iii) Section 9004(h) of the Act provides that stock loss must be "substantiated to the satisfaction of the [D]epartment," 75 Pa.C.S. § 9004(h), and Petitioner did not present sufficient information to deviate from the 0.5% allowed in the Audit

Manual. (S.F. Ex. E, Board of Finance and Revenue May 19, 2009 Order.) Petitioner timely filed a petition for review of the Board of Finance Land Revenue order with this Court.

■■■ On appeal, Petitioner first challenges whether the sales to bus operators that provided services to the School District were exempt from taxation under the Act.[5] Section 9004(a) of the Act, which was in effect during the audit period in question here, provided for a tax of 12¢ per gallon to be imposed and assessed on all "liquid fuels and fuels," which includes gasoline and on-road diesel, "used or sold and delivered by distributors within this Commonwealth."[6] 75 Pa.C.S. § 9004(a). Sales delivered to political subdivisions were exempt from this tax, 75 Pa.C.S. § 9004(e)(4), and political subdivisions are defined to include school districts. 1 Pa. C.S. § 1991; 61 Pa.Code § 315.2.

Petitioner argues that the fuel provided to the bus operators, Spade Bus Lines and Humbert Busing, was used exclusively for transporting School District students. Petitioner further argues that to require that the invoice be sent directly to a school district as opposed to the bus operator who provides the service would favor form over substance and that so long as the school district is the ultimate customer the distinction of what entity pays for the fuel is immaterial.

While acknowledging that sales directly to the School District would clearly be

---

4. The Commonwealth did not appeal the abatement of the penalty against Petitioner to the Board of Finance and Revenue.

5. In appeals from determinations of the Board of Finance and Revenue, this Court essentially acts as a trial court and exercises the broadest scope of review. *Southern Pines Trucking v. Commonwealth*, 42 A.3d 1222, 1227 n. 5 (Pa.Cmwlth.2012) *aff'd,* —— Pa. ——, 69 A.3d 235 (2013). Our standard of

review is *de novo. Id.* The stipulation of facts entered into by the parties is binding on them, although the Court may draw its own legal conclusions. *Id.* at 1227.

6. Section 9004(a) was stricken from the Act, and the fixed 12¢ per gallon liquid fuels and fuels tax was eliminated by the Act of November 25, 2013, P.L. 974, No. 89, § 40.1, effective January 1, 2014.

exempt, the Commonwealth contends that Petitioner has not shown that the sales it invoiced to the School District were actually sold and delivered to the School District in compliance with Department regulations. We agree.

The Department's regulations provide that:

(a) In order for a political subdivision to purchase liquid fuels in bulk, tax exempt, the fuel shall be purchased from a registered Commonwealth distributor and the fuel shall be placed in bulk storage facilities owned or leased by the political subdivision.

(b) When a school district leases or owns vehicles, whether or not the vehicles are operated by school district employes, the school district may purchase liquid fuels tax exempt from a Commonwealth registered distributor, provided the fuel is placed in bulk storage facilities, leased or owned by the school district.

61 Pa.Code § 315.3.[7] The requirement that sales must be made directly to and placed in bulk storage facilities leased or owned by the exempt entity also appears in the Department's Audit Manual and a 1997 policy statement.[8]

Petitioner, who bears the burden of proving the exemption from tax, *City of Philadelphia v. Cumberland County*

*Board of Assessment Appeals,* — Pa. —, 81 A.3d 24, 25 n. 1 (2013), has not presented any evidence before this Court that shows that it made sales directly to bulk storage facilities owned or leased by the School District as required by the Department's regulations. Rather, the contracts between the School District and the bus operators only show that the School District purchased transportation services from the bus operators. (S.F. Exs.F–1, F–2.) While these contracts include an escalation and de-escalation fuel clause by which the School District agreed to adjust the amount it paid to the bus operators if fuel prices exceeded or fell below certain prices, these contracts do not provide that the School District would pay for the diesel fuel directly. (*Id.*) Furthermore, the April 17, 2009 letter from Spade Bus Lines which Petitioner cites to support its argument that the sales qualify as exempt, demonstrates only that the fuel purchased from Petitioner was used solely for the transportation of School District students and not that the School District purchased the fuel directly.[9] (S.F. Ex.D.)

In *Crawford Central School District v. Commonwealth,* 839 A.2d 1213 (Pa. Cmwlth.2004), *aff'd in part, rev'd in part,* 585 Pa. 131, 888 A.2d 616 (2005), this Court addressed a similar question of whether sales to a contractor working on

7. The Department's regulations were promulgated under the former Liquid Fuels Tax Act and Fuel Use Tax Act; however, these regulations remain consistent with the provisions of current Act. Petitioner has not challenged the validity of these regulations in this appeal.

8. Audit Manual § FT550.300; Bureau of Motor Fuel Taxes Policy Statement No. 97–01: Sales to Exempt Entities by Registered Distributors and Non-licensed Motor Fuel Dealers, http://www.revenue.state.pa.us/portal/server.pt/document/635811/dmf–65_pdf (last visited Feb. 25, 2014). Petitioner has not raised the issue in this appeal of the appropri-

ate deference to and procedural validity of the Department's manuals and bulletins. *See Northwestern Youth Services, Inc. v. Department of Public Welfare,* — Pa. —, 66 A.3d 301, 310–15 (2013) (setting forth standards for challenges to deference and procedural validity of non-legislative rules).

9. Petitioner also cites a June 8, 2009 letter from Humbert Busing; however that letter only appears as an exhibit to Petitioner's brief and is not included in the stipulation of facts which creates the record before us in this appeal. Pa. R.A.P. 1571(f).

behalf of a political subdivision should also be considered exempt. In that case, a contractor purchased materials for the construction of a new school building and then assigned to the school district its right to seek a refund for sales and use tax paid on the purchase of materials. 839 A.2d at 1214. We held that, even though the purchases were made entirely for the benefit of the school district and would have been exempt if made by the school district directly, the school district, as assignee of the contractor's rights, was not entitled to a refund. *Id.* at 1216. The Supreme Court affirmed, concluding that the contractor could not derivatively take advantage of the school district's tax-exempt status as a political subdivision. 585 Pa. at 140, 888 A.2d at 621–22. Likewise here, though the fuel purchased by the bus operators may have been used exclusively for School District transportation, the sales were not made to the School District directly and the bus operators cannot take advantage of the School District's tax-exempt status. Therefore, we conclude that Petitioner was not entitled to seek an exemption on the fuel sales to the bus operators.

■ Petitioner next argues that its gasoline sales to Tableland, which operated the Somerset County Head Start Program, were exempt sales under the Act. Specifically, Petitioner argues that, as a "community action agency" that received funding from and coordinated social services programs on behalf of the Commonwealth and local governments, Tableland fell within the Department's definition of a political subdivision as an "[i]nstrumentalit[y] or agenc[y] of the Commonwealth." 61 Pa. Code § 315.2.

■ In determining whether an entity is an agency or instrumentality of the Commonwealth, we must examine the entity's enabling legislation. *Valentine Co. v. Commonwealth*, 973 A.2d 1101, 1107 (Pa. Cmwlth.2009); *Bucks County Community College v. Bucks County Board of Assessment Appeals*, 147 Pa.Cmwlth. 505, 608 A.2d 622, 623–24 (1992). An entity's status as an agency or instrumentality may vary depending on the issue for which the determination is being is made. *Pennsylvania State University v. Derry Township School District*, 557 Pa. 91, 96, 731 A.2d 1272, 1274 (1999). The mere funding of an entity does not, by itself, make the entity an agency or instrumentality of the Commonwealth. *Id.* at 95, 731 A.2d at 1274; *Mooney v. Board of Trustees of Temple University*, 448 Pa. 424, 430, 292 A.2d 395, 399 (1972). We must also consider to what degree the Commonwealth exercises control over the entity, such as through majority control over the entity's board. *Pennsylvania State University*, 557 Pa. at 96, 731 A.2d at 1274–75; *Mooney*, 448 Pa. at 431, 292 A.2d at 399.

Community action agencies were initially created pursuant to the federal Economic Opportunity Act of 1964 to coordinate economic opportunity programs for local governments. *See* 42 U.S.C. §§ 2781–2837 (repealed). In Pennsylvania, during the relevant audit period here, community action agencies were governed by the Community Action Agencies Act (CAA Act) [10] and the Community Services Block Grant Act (Block Grant Act).[11] The CAA Act provides that the agencies were entitled to receive grants through the Department of Community and Economic Development "not to exceed ten percent of the total cost of the community action pro-

---

10. Act of January 26, 1968, P.L. 48, No. 9, 62 P.S. §§ 2801–2802.

11. Act of May 16, 2002, P.L. 315, No. 46, 62 P.S. §§ 2992.1–2992.13. This statute expired on December 31, 2011.

gram" and authorized the Department of Community and Economic Development to promulgate regulations. 62 P.S. §§ 2801–2802. These regulations govern the submission of grant proposals and the execution of contracts, require community action agencies to submit plans for services, budgets and financial reports, require the agencies to post a fidelity bond in favor of the Commonwealth, and provide for the auditing of Commonwealth grant expenditures. 12 Pa.Code §§ 133.1–133.73. The Block Grant Act provided for the distribution of federal grants to community action agencies and the monitoring of the agencies to assure compliance with the grant obligations. 62 P.S. §§ 2992.1–2992.13. Significantly, Pennsylvania law makes clear that community action agencies may be either public or private entities. *See* Section 4(a) of the Block Grant Act, 62 P.S. § 2992.4(a) ("These community action agencies may be an arm of the designating unit of government or other eligible entity...."); 12 Pa.Code § 133.1 (defining community action agency as "[a]ny private or public nonprofit community action agency which is recognized under the Federal Economic Opportunity Act of 1964 ... and which coordinates economic opportunity programs for cities, boroughs, town, townships and counties within this Commonwealth"); *see also* 42 U.S.C. § 2790(a) (providing under repealed provision of federal Economic Opportunity Act that a community action agency could be a state, a political subdivision of a state "or a public or private nonprofit agency or organization which has been designated by a State or such a political subdivision").

Petitioner argues that the Commonwealth's funding and close regulation of Tableland demonstrate that Tableland was an agency and instrumentality of the Commonwealth. Petitioner also finds support in the testimony of the director of the Somerset County Head Start program for Tableland that: (i) the funds provided by the Commonwealth extend the days and hours of the Head Start program (S.F. Ex. G, McDonough Dep. at 11); (ii) the Commonwealth regulates eligibility in the Head Start program (*Id.* at 15); and (iii) representatives from the Commonwealth regularly made classroom visits. (*Id.* at 13.)

Petitioner has not satisfied its burden of showing that Tableland was an agency or instrumentality of the Commonwealth rather than simply a contractor that receives funds and provides service to the Commonwealth. While Tableland may have received grants from the Commonwealth, the mere fact that Tableland's activities were government funded is insufficient to show that it is a Commonwealth agency. *Pennsylvania State University*, 557 Pa. at 95, 731 A.2d at 1274; *Mooney*, 448 Pa. at 430, 292 A.2d at 399. Indeed, the Commonwealth is prohibited under the CAA Act from providing more than 10% of a community action agency's budget. Section 1 of the CAA Act, 62 P.S. § 2801. Similarly, the fact that Tableland is monitored by and must provide regular reports on its budget and finances to the Commonwealth does not alone distinguish it from one of the many other closely regulated private entities within the state. Petitioner has also produced no evidence that the Commonwealth directs Tableland's activities by appointing its directors or executive staff. The only evidence in the record regarding the management of Tableland is the testimony of McDonough that she must report both to the Tableland Board of Directors and a Head Start Policy Council, a majority of which is composed of parents of children enrolled in the Head Start program. (S.F. Ex. G, McDonough Dep. at 25–26.)

▬ In *Sanchez by Rivera v. Montanez*, 165 Pa.Cmwlth. 381, 645 A.2d 383

(1994), we addressed the similar question of whether a community action agency designated by Lancaster County to provide daycare services was a local governmental unit entitled to immunity under the Political Subdivision Tort Claims Act.[12] We held that the community action agency was not a local governmental unit, concluding that government regulation and funding was insufficient to show that the community action agency was a government unit without evidence of government supervision of the day-to-day operations of the agency. *Id.* at 387–90, 645 A.2d 383; *see also United States v. Orleans*, 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976) (holding that a community action agency is not a federal agency or instrumentality for purposes of the Federal Tort Claims Act). Here also, there is no evidence that the Commonwealth directly controlled or supervised the actions of Tableland in administering the Somerset County Head Start program. Accordingly, we hold that Tableland was not a political subdivision under the Act.[13]

▮ Finally, Petitioner challenges the auditor's excessive stock loss determination. In making the determination that the amount of loss when comparing the amount of fuel in inventory with the amount of fuel sold, the auditor applied the Department's long-standing policy that any stock loss greater than 0.5% was excessive. (S.F. Ex. A, Narr. at 16–17.) Pe-

titioner argues that its stock loss of 1.4% of the total sales of gasoline and 0.8% of the total sales of on-road diesel was reasonable and that a 0.5% allowed loss did not take into consideration temperature change at Petitioner's different locations. Petitioner asserts that when it purchases gasoline and on-road diesel from suppliers, the volume of the fuel is temperature compensated to 60 degrees. (S.F. ¶ 16.) Petitioner's underground storage tanks, on the other hand, are not adjusted for temperature but rather fluctuate between 50 and 55 degrees year round. (*Id.* ¶¶ 17, 18.) Petitioner argues that the auditor should have looked at various factors including the date of the last delivery at each location, the amount of fuel in the tank at the time of delivery, the temperature of the product when delivered and the temperature of the existing product in the tank at the time of delivery.

The Act provides that the Department "shall allow for handling and storage losses of liquid fuels and fuels that are substantiated to the satisfaction of the department." 75 Pa.C.S. § 9004(h). The Department sets forth a default 0.5% allowed loss provided for in its Audit Manual. (Audit Manual § FT570.030.) The Commonwealth contends that Petitioner's temperature change rationale to explain the stock loss in excess of 0.5% was not sufficiently substantiated with documentation to either the auditor or on appeal to this Court. We agree.

12. Act of November 26, 1978, P.L. 1399, *as amended, formerly* 53 P.S. §§ 5311.101–5311.803, repealed by the Act of October 5, 1980, P.L. 693, recodified in the Judicial Code, *as amended*, 42 Pa.C.S. §§ 8541–8542.

13. Petitioner also argues that the Department did not object to exempt sales to Tableland in at least five previous audits and that it is estopped from changing its policy without an official pronouncement of its new interpretation of the Act. As our Supreme Court has recognized, however, the Commonwealth

cannot be estopped from collecting a tax that is due in the present based upon its failure to collect that same tax in the past. *Weinberg v. State Board of Examiners of Public Accountants*, 509 Pa. 143, 151 n. 5, 501 A.2d 239, 243 n. 5 (1985); *Department of Public Welfare v. UEC, Inc.*, 483 Pa. 503, 516 n. 6, 397 A.2d 779, 785 n. 6 (1979) ("Mistaken indulgence by, or errors of, the Commonwealth in the past do not insulate the taxpayer from tax liability for subsequent years.").

The Auditor found that the stock control worksheets prepared by Petitioner did not separate fuel stock by storage location and were thus insufficient to allow for a temperature analysis. (S.F. Ex. A, Narr. at 16.) The auditor did attempt a temperature analysis for gasoline fuel based on the average temperature in the counties in which Petitioner's facilities are located, but the results of this analysis did not justify a stock loss in excess of 0.5%. (*Id.* at 17.) On appeal, Petitioner has not presented any additional evidence—or offered any alternate explanation, such as slippage, accident or theft—that would remedy his deficient recordkeeping. While the parties stipulated to facts concerning the temperature at which Petitioner purchases and stores gasoline and diesel fuel for the appeal (S.F. ¶¶ 16–19), this information alone does not provide a basis to substantiate the alleged temperature variation that would explain the excess stock loss.

Because Petitioner failed to produce sufficient evidence to substantiate its stock loss, we conclude that the auditor correctly determined that the stock loss greater than 0.5% was excessive.

The order of the Board of Finance and Revenue is affirmed.

### ORDER

AND NOW, this 20th day of March, 2014, the order of the Board of Finance and Revenue in the above-captioned matter is hereby AFFIRMED. The Chief Clerk is directed to enter judgment in favor of the Commonwealth if exceptions are not filed within 30 days pursuant to Pa. R.A.P. 1571(i).